2020 IL App (2d) 190773-U
No. 2-19-0773
Order filed February 3, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re S.B. & K.B., Minors, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | Nos. 15-JA-68 |
| | ) | 16-JA-305 |
| | ) | |
| (The People of the State of Illinois, Petitioner-Appellee, v. Dinesha S., Respondent-Appellant). | ) | Honorable |
| | ) | Francis M. Martinez, |
| | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hudson and Bridges concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not err in finding the respondent unfit or terminating her parental rights to her minor children.

¶ 2   The respondent, Dinesha S., appeals from the judgment of the circuit court of Winnebago County finding her to be an unfit parent to her sons K.B. and S.B. and terminating her parental rights.  On appeal, the respondent argues that the trial court's determination was against the manifest weight of the evidence.  We affirm.

¶ 3                                I. BACKGROUND

¶ 4    K.B. was born on December 8, 2014.  On December 22, 2014, at 4 a.m., the respondent went to the emergency room with two-week-old K.B., "screaming" that she needed morphine for restless leg syndrome pain.  The respondent was given Dilaudid.  She did not feed or change K.B. during the hospital visit.

¶ 5    On December 24, 2014, the respondent returned to the emergency room and demanded Dilaudid, which the doctor declined to prescribe for her.  She was slurring her words and was staggering and unsteady.  She declined to care or feed K.B. while she was at the emergency room. She stated that she wanted nothing to do with K.B., and she demanded the emergency room staff care for him instead.  She had not brought food, clothing or diapers with her.  The respondent was given a Norco pill and Xanax.  The Department of Children and Family Services (DCFS) was contacted due to the respondent's alleged inadequate supervision of K.B.  DCFS implemented a safety plan for K.B. wherein K.B.'s father (T.B.) or K.B.'s grandmother would supervise all contact between K.B. and the respondent.

¶ 6    On December 29, 2014, the respondent tested positive for cocaine.

¶ 7    On February 9, 2015, a new DCFS caseworker was assigned to K.B.'s case.  She was unable to contact the respondent, T.B., or K.B.'s grandmother until February 20.  On that day, the caseworker went to the respondent's new home where she lived with T.B.  The respondent explained that she had moved into her new one-bedroom apartment on February 17 because her previous apartment was too expensive.  Her brother's girlfriend and three kids were staying with them because her brother had gone to jail for beating his girlfriend up.  The respondent acknowledged that she had recently used marijuana.  The caseworker believed that the respondent did not appear bonded to K.B.  The caseworker therefore decided to take K.B. into protective care. The respondent was very cooperative and immediately handed K.B. over to the caseworker.  At

this time, T.B. woke up and became very agitated and took K.B. back from the caseworker. The police were then called. T.B was then arrested for physically interfering with DCFS and police attempts to take protective custody of K.B.

¶ 8    Following the arrest of T.B., the police advised the respondent not to bond him out of jail due to her comments that she would be unsafe when he was released. Nonetheless, the respondent bonded him out because, she explained, the situation would be worse if she did not bond him out. After T.B. was released, the caseworker asked the respondent if he had hurt her. The respondent asked: "what do you think?"

¶ 9    On February 24, 2015, the State filed a two-count petition alleging that K.B. was a neglected minor. Count I alleged that K.B. was neglected because his environment was injurious to his welfare in that the respondent had a substance abuse problem that prevented her from properly parenting him. Count II alleged that K.B.'s environment was also injurious to his welfare because his father angered easily and caused his mother to fear for her physical safety, thereby placing K.B. at risk of harm.

¶ 10    On May 13, 2015, the trial court adjudicated K.B. neglected. On June 29, 2015, K.B. was made a ward of the court and DCFS was named as his guardian and custodian. Service plans were created for the respondent that required her to engage in substance abuse treatment, have individual psychotherapy, and take domestic violence classes and parenting classes.

¶ 11    On December 17, 2015, at a permanency hearing, the trial court found that the respondent was making reasonable efforts and reasonable progress towards the goal of having K.B. return home to live with her.

¶ 12    On March 17, 2016, the respondent gave birth to S.B. In early August 2016, a caseworker observed the respondent to have slow movements and slurred and unintelligible speech. On

August 16, 2016, the respondent and T.B. failed to answer repeated knocking and phone calls when K.B. was brought to the residence for a scheduled visitation, while S.B. was still in the home. The caseworkers were also concerned that the respondent continued to allow T.B. to be around S.B., despite his ongoing misuse of alcohol and cocaine and his domestic violence towards her. On August 26, 2016, S.B. was removed from the respondent's care and custody because the respondent's medications led her to be unable to care for him, and she failed to seek medical assistance until after he was removed from her care.

¶ 13    On August 29, 2016, the State filed a six-count petition alleging that S.B. was neglected due to his parents' substance abuse problems, the history of domestic violence in the home, and because his parents had failed to cure the conditions that had resulted in his older brother being removed from the home.

¶ 14    On November 7, 2016, the trial court found that S.B. was neglected. On December 7, 2016, S.B. was made a ward of the court and DCFS was named as his guardian and custodian. The service plans for the respondent recommended that she participate in domestic violence services, parenting education classes, substance abuse assessment, individual/couples therapy, and a psychological evaluation. On May 25, 2017, the trial court found that the respondent had made reasonable efforts but deferred a finding as to progress toward the return home goal.

¶ 15    On July 23, 2017, the respondent gave birth to L.B. Except for a brief period of time, L.B. was in the respondent's care from the time he was born.

¶ 16    On November 29, 2017 and May 3, 2018, the trial court conducted permanency hearings. On both occasions, the trial court found that the respondent was making reasonable efforts but not reasonable progress towards the goal of returning home K.B. and S.B.

¶ 17    On November 2, 2018, the trial court again found that the respondent was making reasonable efforts but not reasonable progress towards the return home goal. The trial court therefore changed the goal to substitute care pending court determination of termination of parental rights.

¶ 18    On November 14, 2018, the State filed motions to terminate the respondent's parental rights to both K.B. and S.B. The State's two-count motions alleged that (1) the minors had been in foster care for 15 months out of any 22 month period (see 750 ILCS 50/1(m-1) (West 2018)) and (2) the respondent had failed to protect the children from conditions within their environment injurious to their welfare (see 750 ILCS 50/1(g) (West 2018)).

¶ 19    Between March 8, 2019, and April 26, 2019, the trial court conducted a hearing on the State's motions. The State informed the trial court that it was withdrawing the count alleging that the minors had been in foster care for 15 months out of any 22-month period. The trial court granted the State's request that it take judicial notice of the neglect petitions, orders of adjudication, orders of dispositions, and all orders following permanency reviews.

¶ 20    On May 9, 2019, the trial court conducted a dispositional hearing as to L.B. On May 29, 2019, the trial court determined that the respondent should retain guardianship and custody of L.B. while she continued to engage in services.

¶ 21    On May 30, 2019, the trial court found that the respondent was unfit as to K.B. and S.B. for purposes of the State's motion to terminate parental rights. In so ruling, the trial court acknowledged that it had just found the respondent fit as to the third sibling, L.B., on the previous day. However, the trial court explained that was based on the evidence that was relevant to that case.

¶ 22    On July 30, 2019, the trial court conducted the best interest portion of the hearing.  A caseworker testified that K.B. and S.B. had only been in one foster home and that the home was safe and appropriate.  She further testified that the boys were well cared for.  She testified that the children did not generally ask or inquire about the respondent outside of visitation.  The respondent testified as to her bond with the boys and about her visitation.  The respondent also acknowledged that, at the time of the hearing, there were criminal charges pending against her for endangering the life of L.B. due to her driving under the influence.

¶ 23    On September 5, 2019, the trial court terminated the respondent's parental rights to K.B. and S.B. after finding that it was in their best interests.[1]  The respondent thereafter filed a timely notice of appeal.

¶ 24                                II. ANALYSIS

¶ 25    The respondent contends that the trial court erred in finding that she was unfit to parent her children and that it was in their best interest that her parental rights be terminated.  The respondent insists that she had made real progress in correcting the conditions that brought her children into DCFS custody.  She argues that it would be absurd to find her unfit based on the reasons for the initial removal because it would render meaningless all the progress she made in her services and sobriety.

¶ 26    Before addressing the respondent's argument, we review the principles applicable to termination proceedings.  The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)) provides a two-step process for the involuntary termination of parental rights.  *In re*

---

[1] T.B.'s parental rights to K.B. and S.B. were terminated during the same proceedings.  His parental rights are not at issue in this appeal.

*Deandre D*., 405 Ill. App. 3d 945, 952 (2010). First, the State must prove that the parent is unfit by clear and convincing evidence. *Id.* Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) lists the grounds under which a parent may be found unfit. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Second, if the court makes a finding of unfitness, the court then considers whether it is in the best interest of the minor to terminate parental rights. *Deandre D*., 405 Ill. App. 3d at 953. The State has the burden of proving by a preponderance of the evidence that termination is in the minor's best interest. *Id.* A trial court's determination of unfitness will not be overturned unless the finding was against the manifest weight of the evidence. *In re Michael M.*, 364 Ill. App. 3d 598, 606 (2006). Further, this court will reverse a best-interest finding only where it is against the manifest weight of the evidence or where the trial court abused its discretion. *Deandre D.*, 405 Ill. App. 3d at 953.

¶ 27    Our supreme court considered the identical argument the respondent raises herein in *In re C.W.*, 199 Ill. 2d 198 (2002). There, the parent was found unfit under section 1(D)(g) based on her conduct before the children were removed, where the environment included abusive relationships with the children's fathers and the children had bruises at the time of removal. *C.W.*, 199 Ill. 2d at 201-04, 215. The respondent argued that was an improper basis to find her unfit because it rendered meaningless the services that she had received and her successful completion of those services. *Id.* at 216. Our supreme court held that it was irrelevant for purposes of section 1(D)(g) whether the parent failed to correct or improve the injurious conditions after removal of the child (although this would be relevant to an unfitness finding under other sections, such as section 1(D)(m)). *Id.* at 212-13, 218. Under section 1(D)(g), the parent's conduct before removal was "precisely the kind of evidence a court must consider in making a determination under" this section. *Id.* at 215. As the supreme court explained, evidence of a parent's completion of DCFS

services or refrainment from objectionable conduct after the child has been removed "does not somehow absolve or erase" the initial conduct which led to removal of the child. *Id.* at 217.

¶ 28    Here, the record supports the trial court's finding that the respondent was unfit at the time K.B. and S.B. were removed from her home due to her substance abuse problems and the history of domestic violence in her home. The fact that the respondent attempted to correct or improve the injurious conditions after the children's removal is simply not relevant to the issue of whether the children's environment was injurious when they were removed. See *id.* at 212-13, 218.

¶ 29    In so ruling, we reject the respondent's argument that *C.W.* is distinguishable because that case did not involve a younger sibling whom the trial court found could be parented by his mother. The respondent's argument is simply an alternate way of asking us to consider evidence about the improved conditions in her home after K.B. and S.B.'s removal—evidence that the supreme court has said is not relevant as to the issue of whether the minors' environment was injurious to their welfare at the time they were removed. See *id.*

¶ 30    We next turn to the trial court's ruling on the best interest phase of the proceedings. The Juvenile Court Act sets forth the relevant factors that a trial court is to consider in determining what is in a child's "best interest." 705 ILCS 405/1-3(4.05) (West 2018)). The factors that the trial court is to consider in the context of the child's age and developmental needs are: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and

siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. *Id.*

¶ 31    As noted earlier, the State must prove by a preponderance of the evidence that termination is in the child's best interests. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). We will not disturb the trial court's decision unless that decision is against the manifest weight of the evidence. *In re D.M.*, 336 Ill. App. 3d 766, 773 (2002). The trial court's decision is not against the manifest weight of the evidence, unless the record clearly demonstrates that the opposite result is the correct one. *Id.* Further, in reviewing the trial court's decision, it is not this court's role to re-weigh the evidence or reassess the credibility of the witnesses. *Id.*

¶ 32    Based on our review of the record, there is nothing to indicate that the trial court erred in determining that it was in K.B.'s and S.B.'s best interest that the respondent's parental rights be terminated. In considering K.B.'s and S.B.'s best interest, the trial court found that they had been in the care of foster parents for most of their lives, except for briefs periods of unsupervised visitation, and that they were closely bonded to their foster parents. The trial court further found that the foster parents had demonstrated the ability to meet the challenges of the children and that they were also willing to foster a relationship with the biological parents. The trial court noted that, according to the caseworker, the children did not generally ask or inquire about the respondent outside of visitation. The trial court concluded that, as the overriding purpose of the proceeding was to provide permanency, it was in the best interests of the children to terminate the respondent's parental rights so as to provide them permanency. As the record supports the trial court's findings, we cannot say that the trial court's decision was against the manifest weight of the evidence. See *id.*

¶ 33    The respondent insists that every statutory factor weighed in favor of not terminating her parental rights because she was the only one who could provide an environment where all three siblings could live together.  We find the respondent's argument unpersuasive for three reasons.  First, the respondent is essentially asking us to reweigh the evidence—something that we may not do.  See *id*.  Second, the respondent minimizes the amount of time that K.B. has been with his foster family (since February 2015) and how long S.B. has been with that same family (since August 2016).  As the trial court noted, the children should have permanency in their lives, something they have never enjoyed with the respondent.  Third, the respondent's argument minimizes her April 2019 arrest for driving under the influence while L.B. was her passenger.  Her arrest calls into question whether she will be able to maintain custody of L.B. and therefore undermines her argument that she could provide a home where all three boys could live together.  Further, her DUI arrest indicates that she has still not overcome one of the reasons why K.B. and S.B. were removed from her in the first place—her substance abuse problems.  Accordingly, the fact that she maintains custody of L.B. is not enough to say that the trial court's determination to terminate her parental rights as to K.B. and S.B. was against the manifest weight of the evidence.

¶ 34                                 III. CONCLUSION

¶ 35    For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

¶ 36    Affirmed.